**TEITLER & TEITLER**
John M. Teitler (JT-3111)
Nicholas W. Lobenthal  (NL-1451)
1114 Avenue of the Americas
New York, NY  10036
(212) 997-4400
Attorneys for Defendant One Communications Corp.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Stockholder Representative Committee, on behalf of certain former stockholders of Lightship Holding, Inc., ) <br><br> Plaintiff, ) <br><br> - v. - ) <br><br> One Communications Corp., as successor in interest to CTC Communications Group, Inc., ) <br><br> Defendant, ) <br><br> - and - ) <br><br> Mellon Investor Services LLC, ) <br><br> Nominal Defendant. ) | 07 Civ. 5440 <br> (Judge Swain) <br> (Magistrate Judge Peck) <br> (ECF) |

Stockholder Representative Committee, on
behalf of certain former stockholders of
Lightship Holding, Inc.,                        )
                                                )
                    Plaintiff,                  )
                                                )
        - v. -                                  )
                                                )
One Communications Corp., as successor in       )
interest to CTC Communications Group,           )   07 Civ. 5440
Inc.,                                           )   (Judge Swain)
                                                )   (Magistrate Judge Peck)
                    Defendant,                  )   (ECF)
                                                )
        - and -                                 )
                                                )
Mellon Investor Services LLC,                   )
                                                )
                    Nominal Defendant.          )
_____             )
                                                )
One Communications Corp., as successor in       )
interest to CTC Communications Group, Inc.      )
and CTC Communications Acquisition              )
Corp.,                                          )
                                                )
                    Counterclaim Plaintiff,     )
                                                )
        - v. -                                  )
                                                )
JP Morgan SBIC LLC, Sixty Wall Street           )
 SBIC Fund, L.P., The Megunticook Fund II,      )
L.P., The Megunticook Side Fund II, L.P.,       )
Kevin O'Hare, Jeffrey Koester, Mellon           )
Investor Services LLC as nominal defendant      )

as escrow agent and Verizon New England )
Inc. as defendant on a declaratory judgment )
claim, )
                                            )
                    Counterclaim Defendants. )
                                            )
_____ )

## AMENDED ANSWER AND COUNTERCLAIMS OF
## DEFENDANT ONE COMMUNICATIONS CORP.

Defendant One Communications Corp. ("One Communications"), by its attorneys Teitler & Teitler, Answers the Complaint and sets forth its Counterclaims as follows:

1.     Admits the averments set forth in the first sentence of Paragraph 1.  Denies the averments set forth in the second and third sentences except admits that the plaintiff Stockholder Representative Committee (the "Committee") represents certain former stockholders (the "Stockholders") of Lightship Holding, Inc. ("LHI").

2.     Denies the averments set forth in Paragraph 2 and refers to the Complaint for the nature of the claims asserted and relief sought by the Committee.

3.     Denies the averments contained in the first sentence of Paragraph 3 and refers to the complete Stockholder Representative Agreement for its terms.  Denies knowledge or information sufficient to form a belief as to averments contained in the second sentence of Paragraph 3.  Denies the averments of the third sentence of Paragraph 3 and refers to the Merger Agreement for its terms.

4.     Admits the averments contained in Paragraphs 4 and 5 and refers to the Merger Agreement (hereinafter defined) for its complete terms.

5.     Denies the averments set forth in the first sentence of Paragraph 6 and refers to the Merger Agreement for the terms thereof.  Admits the averments in the second sentence of Paragraph 6 and also refers to the Merger Agreement for the terms thereof.

6.    Denies the averments contained in Paragraphs 7 and 8 and refers to the Merger Agreement for the terms thereof.

7.    Denies the averments set forth in Paragraph 9 and the first sentence of Paragraph 10 and refers to the Merger Agreement and the Escrow Agreement (hereinafter defined) for the terms thereof.    Admits the averments in the second sentence of Paragraph 10.

8.    Denies knowledge or information sufficient to form a belief as to the averments set forth in Paragraph 11 and refers to the Merger Agreement and the Escrow Agreement for the terms thereof.

9.    Denies the averments set forth in Paragraphs 12 and 13 and refers to the Merger Agreement and the Escrow Agreement for the terms thereof.

10.    Denies the averments set forth in Paragraph 14 except admits that in October 2005 One Communications gave notice to the Committee and the Escrow Agent that it had incurred or paid or, in good faith, reasonably believed that it would have to incur or pay Losses in an aggregate amount equal to $3,315,415.90 arising from the claims described in that notice letter and refers to the letter of such date for its terms.

11.    Denies the averments set forth in Paragraph 15 except admits that no funds were released from the indemnification escrow in November 2005.

12.    Denies the averments set forth in Paragraph 16.

13.    Denies the averments set forth in Paragraph 17 except admits that the largest single claim item in the October 2005 notice was in the amount of $2,288,725 and that it was later reduced.

14.    Denies the averments contained in Paragraphs 18-24.

15.    Denies the averments contained in Paragraph 25 except admits that One

Communications adjusted its claims.

16.   Denies the averments set forth in Paragraph 26 except admits the existence of a Claims Notice dated November 17, 2006, and respectfully refers to such Claims Notice for its terms.

17.   Denies the averments set forth in Paragraphs 27-32.

18.   In response to Paragraph 33, One Communications incorporates herein by this reference its responses to Paragraphs 1 through 32 of the Complaint as though fully set forth in this response.

19.   Denies the averments contained in Paragraph 34-37.

20.   In response to Paragraph 38, One Communications incorporates herein by reference its responses to Paragraphs 1-37 as though fully set forth in this response.

21.   Denies the averments contained in Paragraphs 39-42.

22.   In response to Paragraph 43, One Communications incorporates herein by reference its responses to Paragraphs 1-42 as though fully set forth in this response.

23.   Admits the averments contained in Paragraph 44.

24.   The averments contained in Paragraph 45 of the Complaint purports to characterize and summarize certain claims and causes of action asserted by the Committee and require no response.  To the extent that a response is deemed to be required, the averments contained in Paragraph 45 are denied.

25.   In response to paragraph 46, One Communications incorporates herein by reference its responses to Paragraphs 1 through 45 as though fully set forth in this response.

26.   Denies the averments set forth in Paragraph 47, except admits the existence of the Escrow Agreement and respectfully refers to the Escrow Agreement for its terms.

27.   Denies the averments contained in Paragraph 48.

## AFFIRMATIVE DEFENSES

### First Affirmative Defense

The Committee's claims are barred by estoppel and unclean hands and by the Committee's fraud and illegal conduct.

### Second Affirmative Defense

The Committee's claims are barred by the doctrine of laches.

### Third Affirmative Defense

The Committee's claims are barred by the terms of the contracts and the Agreements including the Merger Agreement and the Escrow Agreement upon which the Committee purports to rely.

### Fourth Affirmative Defense

The Committee has waived any and all claims against One Communications arising out of or related to the transactions at issue in this action.

### Fifth Affirmative Defense

The Committee has released One Communications from any and all claims arising out of or related to the transactions at issue in this action.

### Sixth Affirmative Defense

The Committee has failed to state claims upon which relief can be granted and lacks standing.

### Seventh Affirmative Defense

The Committee may not rely upon the terms of the Agreements which it has breached.

## COUNTERCLAIMS

28.    This action arises from a carefully orchestrated scheme of JP Morgan SBIC LLC,

Sixty Wall Street SBIC Fund, L.P., The Megunticook Fund II, L.P., The Megunticook Side Fund

II, L.P., Kevin O'Hare and Jeffrey Koester (the "Fraud and Securities Claims Defendants"),

furthered by a pattern of false statements and deceptive conduct, to defraud Counterclaim

Plaintiff One Communications of tens of millions of dollars in connection with its acquisition of

LHI, a regional telecommunications service provider.  One Communications brings this action

for monetary damages against the Fraud and Securities Claims Defendants for violation of

Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder,

fraud, negligent misrepresentation and breaches of representations and warranties.  In addition,

Counterclaim Plaintiff brings this action against nominal Additional Counterclaim Defendant

Mellon Investor Services, LLC ("Mellon"), only for release of escrowed funds, and against

Additional Counterclaim Defendant Verizon New England Inc. ("Verizon") for a declaratory

judgment pursuant to 28 U.S.C. § 2201 as to whether or not sums of money are owed to Verizon

as a result of the acts set forth herein.

### The Parties

29.    Counterclaim Plaintiff is a Delaware corporation with its principal place of business

at 220 Bear Hill Road, Waltham, Massachusetts.  Counterclaim Plaintiff is the successor in

interest to CTC Communications Group, Inc. ("CTC") and CTC Communications Acquisitions

Corp., the entities that were directly engaged in the Merger transaction at issue in this action.

30.    The Committee was on information and belief constituted and appointed to act as

the agent, representative and attorney-in-fact of former Lightship Stockholders in connection

with Lightship's acquisition by CTC and has brought suit herein on behalf of certain former

Lightship Stockholders.

31.    Counterclaim Defendant JP Morgan SBIC, LLC ("JP Morgan SBIC"), is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 270 Park Avenue, New York, New York.  JP Morgan SBIC was a shareholder of LHI, the 100% owner of Lightship Telecom LLC ("Lightship").  JP Morgan SBIC held over 10 million Series BB shares of LHI at the time LHI was sold to CTC.

32.    Counterclaim Defendant Sixty Wall Street SBIC Fund, L.P. ("Sixty Wall Street") is a limited partnership organized under the laws of the State of Delaware with its principal place of business at 270 Park Avenue, New York, New York.  Sixty Wall Street is a co-investment fund for principals of J.P. Morgan & Co., Inc.  Sixty Wall Street's general partner is Sixty Wall Street SBIC Corporation, a Delaware corporation.  Sixty Wall Street held over 2.4 million Series BB shares of LHI at the time LHI was sold to CTC.

33.    JP Morgan SBIC and Sixty Wall Street, together with their respective affiliates, are sometimes hereinafter collectively referred to as the "JP Morgan Entities."

34.    Additional Counterclaim Defendant The Megunticook Fund II, L.P., is a limited partnership organized under the laws of the State of Delaware with its principal place of business at 143 Newbury Street, Boston, Massachusetts 02116.  The Megunticook Fund II, L.P., held over 6 million Series CC shares of LHI at the time LHI was sold to CTC.

35.    Additional Counterclaim Defendant The Megunticook Side Fund II, L.P., is a limited partnership organized under the laws of the State of Delaware with its principal place of business at 143 Newbury Street, Boston, Massachusetts 02116.  The Megunticook Side Fund II, L.P., held over 1 million Series CC shares of LHI at the time LHI was sold to CTC.

36.    The Megunticook Fund II, L.P., and The Megunticook Side Fund II, L.P., together

with their respective affiliates, are sometimes hereinafter referred to as the "Megunticook Entities".

37.    Counterclaim Defendant Kevin O'Hare ("O'Hare") is an individual residing at 48 Steeplechase Drive, Doylestown, Pennsylvania 18901.  At all times relevant to this action, O'Hare was Chairman of the Board of Directors of LHI and CEO of Lightship.  O'Hare held over 900,000 Series AA shares, 22,000 Series BB shares and 700,000 Series CC shares of LHI at the time LHI was sold to CTC.

38.    Counterclaim Defendant Jeffrey Koester ("Koester") is an individual residing at 32 Haskell Lane, Marlborough, Massachusetts 01752.  Koester was, at all times relevant to this action, the Chief Operating Officer of Lightship.  Koester held over 400,000 Series AA and Series CC shares of LHI at the time LHI was sold to CTC.

39.    Additional Counterclaim Defendant Verizon is a corporation organized under the laws of the State of New York with its principal place of business at 185 Franklin Street, Boston, Massachusetts 02110.  Verizon is a party to the declaratory judgment claim, which seeks a declaration as to whether or not sums of money are owed to Verizon as a result of the wrongful acts of other Counterclaim Defendants as described more fully herein below.

40.    Nominal Additional Counterclaim Defendant Mellon is a limited liability company organized under the laws of the State of New Jersey with its principal place of business at 480 Washington Boulevard, Jersey City, NJ 07310.  Mellon is the escrow agent under the Escrow Agreement executed between and among CTC, the Committee as and on behalf of former stockholders of LHI, and Mellon, dated as of May 20, 2005 (the "Escrow Agreement").

41.    In the Escrow Agreement, the Committee representing the JP Morgan Entities, O'Hare and Koester, among others, submitted to personal jurisdiction in this Court with respect

to this action.  In the Voting Agreement dated March 21, 2005 ("Voting Agreement"), the

Morgan Entities, the Megunticook Entities, O'Hare and Koester submitted to personal

jurisdiction in this Court with respect to this action.  In the Confidentiality, Non-Competition and

Non-Solicitation Agreement dated as of May 20, 2005 ("Confidentiality Agreement"), the

Megunticook Entities submitted to personal jurisdiction in this Court with respect to any action

arising out of or related to that Agreement.  The Escrow, Voting and Confidentiality Agreements

were entered into as a part of the sale of LHI to CTC.

### Regulatory Background

42.    Two types of communications providers offer service in the traditional telephone

market.  The first type, known as local exchange carriers ("LECs"), transport calls within local

calling areas.  Consumers typically refer to LECs as local telephone companies.  Generally

speaking, an incumbent local exchange carrier ("ILEC") is a local phone company that provided

monopoly local telephone service before passage of the Telecommunications Act of 1996.

Verizon is an ILEC.  A competitive local exchange carrier ("CLEC") is a local exchange carrier

other than an ILEC.  Lightship is a CLEC.

43.    The second type of communications provider, known as interexchange carriers

("IXCs"), transport calls between local exchanges and rely on the LECs at the local exchanges

for access to consumers (*i.e.*, to bring a call to the IXC from the calling party or from the IXC to

the called party).  Consumers typically refer to IXCs as long-distance telephone companies.

Depending on the nature of a particular call, a single carrier may operate as a LEC, an IXC or

both.

*Reciprocal Compensation and Access Charges*

44.    When one LEC terminates a call that originated with another LEC's customer in the

same local calling area (commonly referred to as a local call), the terminating LEC receives a "reciprocal compensation" payment or a negotiated alternative from the originating LEC; however, if the terminating LEC's customer is an Internet Service Provider ("ISP"), the terminating LEC may receive from the originating LEC an ISP-bound payment capped under Federal Communications Commission ("FCC") decisions at $0.0007 per minute.

45.    When a LEC either originates or terminates a traditional call that crosses from one local calling area to another (commonly referred to as a long-distance call), it receives an "access charge" payment from the IXC that carried the call.  Depending on whether the call crosses State lines, the LEC will charge the IXC either an intrastate access charge or an interstate access charge.

46.    The applicable intercarrier compensation depends on the locations of the calling and called parties and on the geographic definition of the local calling areas ("LCAs") in which they are located.  For billing purposes, carriers use carrier access billing systems ("CABS") to track call duration and to determine whether reciprocal compensation (or, where appropriate, ISP - bound compensation) or access charges apply to the call.

47.    In order to enable the transmission of communications between providers, Federal law requires ILECs to share their facilities in certain situations, to lease portions of their networks to other LECs in certain situations and to interconnect their networks with other carriers.  The agreements by, and through, which LECs interconnect and exchange traffic between their networks are called interconnection Agreements ("ICAs").

*Virtual NXX*

48.    Telephone numbers in the United States consist of ten digits, commonly represented as NPA-NXX-XXXX.  The "NPA" digits refer to the area code.  The "NXX" digits refer to the

number's central office code and also generally associate the number with a particular rate center or LCA. Typically, because each "NPA-NXX" is associated with a specific geographic area, LECs and IXCs use the NPA and NXX digits to determine whether a call is local or long distance and, accordingly, what form of intercarrier compensation applies (*e.g.,* reciprocal/ISP-bound compensation or access charges).

49. Typically, when a LEC assigns a number to a customer, it assigns a number with an NXX corresponding to the customer's physical location. In contrast to this typical service, under a "Virtual NXX" service (known as "VNXX"), a LEC assigns the customer a telephone number with an NXX associated with a local calling area other than the one in which the customer is physically located. This allows callers from that other local calling area to call the VNXX subscriber without paying long-distance charges. Under applicable Federal and State precedent, a CLEC providing VNXX service is not entitled to collect terminating access charges from the LEC that originated the call.

50. CLECs sometimes provide VNXX service to ISPs that provide dial-up Internet access service. ISPs often obtain many different VNXX numbers assigned to many different LCAs. This allows the ISPs' customers to dial in to numbers that are local based on the customers' physical locations. As a result, the ISPs' customers do not incur long-distance charges when they dial in to their ISP, even though they are not located in the same LCA as the ISP.[1] In the time period at issue in this suit, the communications regulators in Maine, New Hampshire and Vermont had either implemented prohibitions on the use of such VNXX services or had begun implementing such prohibitions.

---

[1]    This is different from a "foreign exchange" or "FX" arrangement in which the LEC serving the ISP provides or purchases from the ILEC dedicated transport from the LCA in which the ISP's Customer is located to the LCA in which the ISP is located.

51.    During the time period covered by this Counterclaim and continuing through the present, ISP-bound traffic has been subject to an intercarrier compensation regime separate from that applicable to traditional (non-ISP-bound) traffic.  For local ISP-bound traffic (*i.e.*, ISP-bound traffic that originates and terminates within a single LCA), the originating LEC pays the terminating LEC a charge capped at $0.0007 per minute.  Non-local, intrastate ISP-bound traffic (*i.e.*, ISP-bound traffic that originates and terminates in different LCAs within a single State) is subject to intercarrier compensation rules established by State regulators.

## Facts Common To All Counts

52.    In June 1998, Lightship was created to engage in the business of providing telecommunications services to business and retail customers in specific geographical locations.  At or about this time, LHI was formed to hold 100 percent of the stock of Lightship.  Additional Counterclaim Defendant O'Hare was appointed the Chairman of the Board of Directors of LHI and CEO of Lightship.

53.    In or about 1998, Lightship became a licensed CLEC in Maine, New Hampshire, Vermont, and Massachusetts.  Lightship's revenue from operations in Maine soon became the single largest component of its revenue stream.

### The JP Morgan and Megunticook Entities

54.    In or about September 1999, Lightship secured $15 million of investment capital from Sixty Wall Street and certain entities related to J.P. Morgan & Co., Inc.  LHI expanded its Board to include two representatives of the JP Morgan Entities.  The JP Morgan Entities at all times thereafter maintained designees on the LHI Board who were actively involved in overseeing the financial condition and operations of Lightship.

55.    In or about December 2000, LHI borrowed $20 million pursuant to a bridge loan from the JP Morgan Entities.

56. In or about February 2002, the bridge loan was converted to equity providing the JP Morgan Entities with a majority equity stake in LHI. Additionally, the JP Morgan Entities invested another $5 million and obtained additional shares of LHI.

57. At or about this time, the Megunticook Entities also made substantial investments and received stock in LHI. Two designees of the Megunticook Entities joined the LHI Board. At all times thereafter, the Megunticook Entities' Board representatives were actively involved in overseeing the financial condition and operations of LHI and Lightship.

58. As a result of these financings, LHI was principally owned directly or indirectly by the JP Morgan Entities and the Megunticook Entities.

*The Operational Profile Changes*

59. In or about January 2002, Lightship opted into an existing ICA between Verizon and Level 3 Communications, LLC, covering the State of Maine. Thereafter, Lightship and Verizon executed "Amendment No. 1" which amended certain terms of the underlying ICA. The ICA, as amended by Amendment No. 1 and its successors (the "Maine ICA"), provides that determining the applicable form of intercarrier compensation (reciprocal compensation, access charges, or ISP-bound compensation) depends on the geographic scope of LCAs as defined by Verizon.[2]

60. By January 2004, Stephan Oppenheimer ("Oppenheimer") was serving as the JP Morgan Entities' designee on LHI's Board. Thomas Matlack ("Matlack") served as the Megunticook Entities' designee on LHI's Board. Throughout their respective terms as Directors, Oppenheimer and Matlack received reports tracking Lightship's financial condition and operations.

61. In or about October 2004, the largest ISP in Maine, Great Works Internet ("GWI"),

---

[2] Lightship and Verizon executed a separate Amendment No. 1 covering the State of Vermont which was identical in all material respects to the Maine Amendment No. 1.

entered into a contract with Lightship for Lightship to provide all of GWI's telecommunications services, by and through which GWI's thousands of customers would access the internet. By January 2005, intercarrier compensation stemming from calls bound for GWI constituted Lightship's single largest source of revenue in Maine, which was Lightship's largest revenue producing State.

62.    At or about the same time, Lightship retained an investment banking firm, Q Advisors LLC ("Q Advisors"), to explore a possible sale of the company. Throughout October 2004, O'Hare, in consultation with Oppenheimer and Matlack, met with Q Advisors and reviewed materials, including a confidential information memorandum (the "CIM"), created by Q Advisors to be provided to potential purchasers and used in the marketing of Lightship.

*Lightship's Deliberate Inflation of EBITDA*

63.    Under the Maine ICA, Lightship was required to use LCAs defined by Verizon for purposes of determining the appropriate intercarrier compensation for a call. Verizon's local service tariffs, publicly filed with the state regulator, defined the applicable LCAs. In turn, Verizon's LCAs were defined in accordance with, and as specified by, regulations of the Maine Public Utility Commission ("Maine PUC").

64.    In the States of Maine, New Hampshire and Vermont, Lightship utilized an internal database known as a "city-to-city table" to define LCAs for purposes of generating customer bills and arranging for payments to and from other carriers. Lightship updated its internal city-to-city table by downloading information from the Local Exchange Routing Guide ("LERG"). The LERG, which is maintained by Telcordia, includes updated rate center and LCA information provided by carriers, including Verizon. Individual carriers use data from the LERG to update their city-to-city tables, thereby ensuring that they have accurate information on the geographic

reach of relevant LCAs, which in turn are used to determine whether reciprocal compensation (or, where appropriate, ISP-bound compensation) or access charges apply to each call. These practices are employed throughout the telecommunications industry to ensure that parties to ICAs have current and consistent and mutual understandings of the appropriate billing rate to be used in these transactions, which involve hundreds of millions of calls annually.

65.    While Lightship had expected an increase in reciprocal compensation as a result of the GWI traffic which began migrating onto its network in October 2004, the increased GWI traffic caused an unexpected spike in Lightship's access charges as well.

66.    In late 2004, Lightship's billing manager Darren Kreitler ("Kreitler") and several other Lightship billing managers noticed this unexpected increase in access charges in Maine. Kreitler discovered that when Verizon had expanded its LCAs in Maine as the Maine PUC had required it to do, Lightship had not changed its city-to-city tables to give effect to the new Verizon LCAs, as Lightship was required to do pursuant to the Maine ICA.[3]  Kreitler realized that the LCAs Lightship was then using were in fact smaller than the Verizon extended LCAs. As a result, traffic originating and/or terminating within the single extended Verizon LCA which also either originated or terminated within the different, smaller Lightship LCAs, was subjected improperly to terminating access charges – the intercarrier payments due on calls connecting one LCA to another – rather than the lower reciprocal compensation charges that apply to calls within a single LCA.

67.    At that time, Kreitler and other billing managers who recognized this problem

_____

[3]    When the Maine PUC directed Verizon, among others, to adopt these new LCAs, they also required that the carriers offer two rate plans for calling within that LCA. One, called the "premium" plan, offered unlimited calling within the entire LCA for a fixed charge per month. The other, called the "economy" plan, offered unlimited calling within a portion of the LCA, with metered per minute charges for calls to the remainder of the LCA.

brought the issue to the attention of Defendant Koester, who was their supervisor, and Bill Wilson, Lightship's Chief Financial Officer, among other senior Lightship management. Kreitler informed Koester that the Maine ICA required Lightship to use the larger current LCAs to determine the applicable intercarrier compensation. A decision was made by Koester, Wilson, and other Lightship senior management that no change should be made to the LCAs currently being utilized by Lightship. Koester instructed Kreitler and the other billing managers to make no changes to Lightship's billing practices.

68.    Soon thereafter, Kreitler discovered that Lightship had failed to update its city-to-city table since 2003. Because the Lightship billing systems were utilizing outdated LERG data, large amounts of local traffic were being improperly designated and billed to Verizon as access charges. The obsolete 2003 LERG data that Lightship had been using resulted in substantially more access charges and fewer reciprocal compensation billings from Lightship to Verizon than if the correct LERG database had been used. As a result of these billing practices, Lightship's revenues and earnings had been materially overstated during the period in which this outdated data was employed, including all of 2004 up to the date of this discovery.

69.    Kreitler also discovered that the Lightship city-to-city table was sensitive to spelling and capitalization and would automatically bill access charges rather than reciprocal compensation rates when the spelling or formatting of a location in the LERG did not exactly match the spelling or format in the city-to-city table. The presence of such spelling and formatting errors improperly resulted in access charges being billed by Lightship to Verizon for calls that should have been characterized as reciprocal compensation. As a result of these billing practices, Lightship's revenues and earnings had been materially overstated during the period in which this erroneous data was employed.

70.   Kreitler promptly updated the Lightship city-to-city table with the correct, current LERG information.  As a result, Lightship's CABS billing system redefined the LCAs based upon the updated data.  The updated LERG provided for LCAs that were larger than the LCAs that Lightship had previously been improperly using, thereby reducing the number of calls that could be billed at the higher long-distance access charges rate.  Kreitler also corrected the spelling and formatting errors in Lightship's city-to-city table so that those errors would not result in the collection of access charges on traffic appropriately subject to reciprocal compensation.

71.   The first bill run utilizing the corrections implemented by Kreitler to the Lightship CABS billing system was generated on or about March 1, 2005, for the month of February 2005. The result of Kreitler's corrections was a significant reduction in Lightship's revenue.  During the period of time in which improper LERG data had been employed and errors in the cross referencing of the LERG data with Lightship's city-to-city table had existed, Lightship revenue had been materially overstated.  As a result, Lightship's 2004 reported earnings before interest, taxes, depreciation and amortization ("EBITDA") was inflated by approximately $200,000 to $300,000 per month (or $2.4 million to $3.6 million annually).

72.   After Kreitler inserted the correct data into Lightship's city-to-city table, and the February billings had been processed and generated, Kreitler reported the revenue results to Lightship's finance department.

73.   Koester learned of the resulting loss of the revenue immediately.  At that time, Koester instructed Kreitler and at least one other Lightship billing manager to reverse Kreitler's corrections.  Koester informed Kreitler that the company "could not afford" the revenue loss resulting from these corrections.  Kreitler responded by stating that his corrections had fixed the

billing system, and bills were now being processed correctly. Koester told Kreitler that "it doesn't matter" and "we need to find a way to increase revenues back to where they were." Kreitler informed Koester that he did not know how the revenue change could be corrected "short of putting an incorrect table" into the CABS billing system. Koester then stated that if Kreitler could not find a way to do it, he would.

74.    Several days later, Koester informed Kreitler and several other Lightship billing managers that Lightship would "replace" the lost revenue associated with the corrections to the database by changing Lightship's city-to-city table to create new, smaller LCAs for purposes of assessing intercarrier compensation. These newly defined LCAs created by Koester and others at Lightship did not reflect the Verizon defined LCAs which, as required by the Maine ICA, should have been the basis for determining intercarrier compensation payments.

75.    In or about March 2005, Kreitler and Koester met with O'Hare and Wilson. At this meeting, they discussed Lightship's use of the smaller Lightship-created LCAs which were at variance with the LCAs defined by Verizon and the Maine PUC and Koester's plan to utilize the new billing protocols and have Lightship define its own LCAs. O'Hare and Wilson agreed with this plan and directed that it be implemented at once.

76.    Koester explained the new billing protocols to Kreitler in detail. Rather than correcting past billing errors, these new protocols included, *inter alia,* changes to the city-to-city table which further *reduced* the size of Lightship's LCAs in the State of Maine, thereby increasing the number of minutes of use which would be improperly charged to Verizon as access charges that originated or terminated outside of these new Lightship-defined LCAs. The effect of implementing Koester's changes was to *increase* the Lightship access charges to Verizon based on LCAs defined by Lightship rather than by Verizon, in violation of the Maine

-18-

ICA.

77.   Kreitler told Koester that the Maine ICA did not allow Lightship to define its own LCAs.  Koester again instructed Kreitler to implement the changes.  Koester said that the decision to implement these changes already had been made and that Kreitler should "let me [Koester] worry about that."

78.   Kreitler and others at Lightship implemented the improper billing practices in or about March 2005.  These protocols reset Lightship's revenue to the levels which existed prior to Kreitler's correction of the database error and did so within a single billing cycle – *i.e.*, before Verizon would have received a reduced bill that would have alerted it to the correction of the database error.

79.   At or about the same time, Lightship was implementing or had implemented a series of additional improper billing practices, which included, *inter alia:*

      (a)   Double Billing.  With respect to local traffic that originated on the network of a third party carrier, transited Verizon's network, and then terminated on Lightship's network, Lightship improperly billed both Verizon  and also the third party carrier for the same reciprocal compensation charges;

      (b)   VNXX Service.  Lightship provided VNXX service in Maine, Vermont and New Hampshire for ISP-bound traffic despite regulations in each state that prohibited VNXX service in this context; and

      (c)   VNXX Billing.  In contravention of Federal and state precedent, Lightship levied terminating access charges on Verizon for calls that originated on Verizon's network and terminated on Lightship's via VNXX service provided by Lightship.

80.   The improper billing practices referred to above in Paragraphs 42 through 79 are collectively referred to herein as the "Undisclosed Lightship Billing Practices".

*The Marketing of Lightship*

81.   In or about November 2004, Q Advisors, in close consultation with O'Hare and

other senior Lightship executives, prepared the CIM, which favorably described Lightship and highlighted its exceptionally strong revenue, EBITDA and growth potential. This information incorporated revenue and other financial data resulting from various of the Undisclosed Lightship Billing Practices.

82.   In November 2004, Q Advisors delivered the CIM to Ken Peterson ("Peterson"), Chairman of the Board of Columbia Ventures Corporation ("Columbia Ventures"), CTC's ultimate parent. Columbia Ventures executives participated in the negotiations of the contemplated transaction on CTC's behalf.

83.   The CIM represented, *inter alia*, that Lightship's EBITDA for 2003 was approximately $5.4 million and EBITDA for 2004 was estimated to be approximately $8 million; that Lightship's adjusted EBITDA margins for 2004 were estimated to be approximately 18.8 percent; that Lightship's adjusted EBITDA growth from 2003 to 2004 was estimated to be approximately 42 percent; and that Lightship projected EBITDA growth of an additional approximately $1.3 million in 2005.

84.   The CIM stated that:

> Lightship is one of the few – if not the only – ICPs that has been able to achieve EBITDA profitability on a revenue of less than $100 million. The company's current gross margins of 58 percent and its adjusted EBITDA margins of approximately 10 percent rival or exceed those of much larger players that have the benefit of scale.

85.   Each and every one of these historical 2004 EBITDA and projected statements relating to EBITDA contained in the CIM was false, materially misleading and based in material part upon various of the Undisclosed Lightship Billing Practices including revenue that Lightship obtained by improperly billing Verizon, and in some cases other carriers, for charges it was not entitled to collect. These practices had the effect of improperly inflating Lightship EBITDA in

an amount of approximately $200,000 to $300,000 per month (or $2.4 million to $3.6 million per year).

86. The CIM invited written offers no later than January 7, 2005.

87. Based on preliminary information supplied by Q Advisors on Lightship's behalf, Peterson and other executives and analysts at Columbia Ventures and CTC identified Lightship as a potential acquisition. Of particular importance to Columbia Ventures and CTC were the historical and projected EBITDA figures contained in the CIM.

88. CTC retained the Bank Street Group LLC ("Bank Street") as its investment bank in connection with the potential LHI transaction.

89. In December 2004, preliminary discussions regarding the terms of the deal, pricing, and timetables occurred between Peterson, various other Columbia Ventures and CTC senior management and Bank Street (all on behalf of CTC) and Q Advisors, O'Hare, Wilson, other members of Lightship senior management, Oppenheimer and Matlack (all on behalf of Lightship and LHI). It was agreed that the primary pricing mechanism for negotiations of the potential purchase price would be a multiple of Lightship's EBITDA.

90. In early December 2004, CTC personnel contacted Q Advisors, requesting additional information, including information about Lightship's CABS billing. This included but was not limited to a letter dated, December 1, 2004, from James P. Prenetta, Jr. ("Prenetta") CTC's Senior Vice President and General Counsel to Q Advisors, setting forth a list of "Follow-up Questions" in which CTC requested:

> additional details regarding Lightship's CABS billing. Specifically, we request information as to (i) the source of that revenue, (ii) the rate that Lightship is charging, (iii) contemplated changes to the rates Lightship charges in the foreseeable future, and (iv) how future changes to any such rates reflected in the projection included in the Information Memorandum . . .

91.    Q Advisors responded on Lightship's behalf to various of these requests, in writing, on December 10, 2004.  In that correspondence, Q Advisors stated with respect to CTC's inquiries regarding CABS revenue:

> Lightship receives CABS revenue for terminating calls on its network originated by non-customers. Interstate makes up 14% of total revenue, intrastate makes up 6% of total revenue and Recip Comp makes up 2% of total revenue.
>
> Lightship's current average intrastate access charge is approximately $0.0536 per minute and its current average IXC/LD rate is approximately $0.0172. The blended rate on a weighted per minute basis is currently $0.0329. These rates incorporate the FCC-mandated rate decrease that took place earlier this year.  Lightship's CABS revenues were largely shielded from this rate drop because of an increase in minutes as a result of overall growth.  As indicated in the Information Memorandum, Lightship's business has doubled in size in the past 24 months. This increase in traffic volume compensated for any drop in the FCC rates.
>
> The Maine interstate rate will drop in June 2005 from $0.053 to $0.018 which is reflected in the projections.  Lightship does not anticipate any changes in other rates, and, as a result, the Company's financial projections do not contemplate any changes in access rates over the forecast period.

92.    These representations were false because Lightship's access revenues in Maine were inflated from the Undisclosed Lightship Billing Practices.  The forecasted rate drop in Maine reflected only a negotiated "step down" of Lightship's rates with Verizon, not the possibility that large portions of Lightship's CABS billings were improper and determined on a basis inconsistent with the Maine ICA.

93.    The representations were also misleading because they claimed to offset FCC mandated rate drops with "overall growth" without noting that this "overall growth" resulted almost exclusively from Lightship's contract with a single customer in Maine (GWI).

94.    In December 2004, Peterson communicated via e-mail with Q Advisors and confirmed that there was non-binding interest from CTC in acquiring LHI and that CTC desired

to proceed with further diligence.  The email stated that "assuming the accuracy of the historical numbers presented," CTC's valuation of Lightship was $55 million to $60 million.

95.    On January 7, 2005, Bank Street, on behalf of CTC, provided an offer letter to Q Advisors.  It proposed a purchase price of $55 million to $60 million which was "based on a preliminary review of [Lightship's] materials and assumes a minimum 2004 EBITDA of $9.4 million and a 2005 EBITDA of $13.3 million as estimated in [Lightship's] November 8, 2004 Confidential Information Memorandum."  The offer letter contained a Preliminary Due Diligence Checklist.  This Checklist included certain categories related to Lightship billing and revenue, including billing systems in place, billing practices, unit financial models, and revenue and gross margin by product.

*Diligence and Misrepresentation*

96.    Shortly after receipt of the offer letter, Lightship indicated its interest in proceeding with negotiations and diligence.  The parties agreed that diligence would begin immediately, and that additional deal terms and the negotiation of the Merger Agreement itself would be resolved simultaneously.  High level Columbia Ventures and CTC personnel, including Peterson and other Columbia Ventures and CTC executives, began conducting direct negotiations and discussions with O'Hare, Oppenheimer, Matlack and other members of Lightship senior management regarding due diligence information and the terms and structure of the transaction.

97.    Representatives of the JP Morgan and Megunticook Entities (including Oppenheimer and Matlack, respectively) were directly involved in the negotiation and diligence process throughout.  Conference calls addressing important aspects of both the deal terms and CTC's diligence requests frequently included O'Hare, Oppenheimer and Matlack, among other participants.  Certain CTC diligence requests were addressed by Oppenheimer and Matlack on

-23-

Lightship's behalf.  Consequently, the JP Morgan and Megunticook Entities at all times had a direct, detailed working knowledge of, and involvement in, both the negotiations and the diligence process, and were aware of particularly important issues raised in due diligence which impacted the pricing of the deal, including information regarding Lightship's billing practices, Lightship's intercarrier compensation revenues in Maine and the impact of this information on Lightship's historical and projected EBITDA.

98.   CTC designated a team of its managers and executives to conduct diligence for the transaction.  CTC made numerous requests for information regarding the validity of Lightship's billing practices.  CTC's diligence requests sought information that, if correctly answered, would have revealed various of the Undisclosed Lightship Billing Practices.

99.   During the initial diligence review in January 2005, CTC personnel from human resources, finance, regulatory, information systems and technology, network operations, sales, legal, regulatory, tax and customer care all reviewed Lightship's data room materials, interacted with various Lightship counterparts, and formulated requests for additional information. Included in this initial diligence were extensive requests for information regarding Lightship's CABS and intercarrier compensation billing practices and the regulatory support therefore, multiple specific requests for explanations for specific types of Lightship billing revenue and data supporting that revenue, and requests for information disclosing the structure, mechanics, and systems associated with Lightship's carrier-to-carrier billing practices, including the specifics of those practices in Maine.  Lightship collected a set of materials responsive to CTC's preliminary diligence requests in a data room at its headquarters in Fort Washington, Pennsylvania.

100. In early January 2005, Kreitler received inquiries from Verizon questioning the large

increase in access charges levied on Verizon the previous month resulting from the GWI traffic -

the same unexpected increase that had lead Kreitler to discover errors in Lightship's billing

database.  Kreitler informed Koester of the inquiry.  At that time, both he and Koester knew this

increase resulted from Lightship's intentional decision to retain the old, smaller, local calling

areas in the wake of Verizon's expansion of its LCA to the extended calling area.  Koester and

Wilson instructed Kreitler to provide responses which concealed from Verizon the fact that this

increased access traffic was resulting from Lightship's intentional use of smaller LCAs.

101. On January 17, 2005, Lightship's management made a presentation to the CTC

diligence team at Lightship's headquarters in Fort Washington, Pennsylvania, which included a

narrated PowerPoint presentation.  Lightship also prepared an agenda for this first day of due

diligence, which included formal presentations by O'Hare, Koester, Wilson, Richard Kendall,

Lightship's Executive Vice President of Sales, and Rainer Gawlick, Lightship's Executive Vice

President of Marketing.

102. The Lightship PowerPoint presentation to the CTC diligence team on January 17,

2005, included, *inter alia*, historical financial results for 2003 and 2004 and projected financial

results for 2005 through 2007.  It also included, *inter alia*, the following representations

regarding Lightship's finances:

> 2004 Projected EBITDA of $10.0MM; 19% EBITDA margin; Lightship is one of
> the few - if not the only - ICP that has been able to achieve EBITDA profitability on a
> revenue base of less than $100 million.

> Advantacs Carrier Access Billing System overview. Switched access billing -
> Summarized CABS records are matched against various database files to compute the
> actual switched access element charges; Reciprocal compensation - Terminating local
> and IntraLATA traffic is billed-Originating traffic is reported for validation purposes.

> Profit Management Program Milestones - Sept. 2004 Engaged industry
> consultants to analyze Interconnection Agreements and conduct audit for revenues and

cost savings; Jan. 2005 - Engaged industry consultants to assist Lightship in implementing formal program structure with appropriate processes and procedures.

103. These historical 2004 EBITDA and projected financial results, and many others contained in the PowerPoint presentation and other disclosures made during this initial diligence conference were false, materially misleading and based in material part upon various of the Undisclosed Lightship Billing Practices, which had the effect of improperly inflating 2004 and projected EBITDA in an amount of $200,000 to $300,000 per month (or $2.4 million to $3.6 million per year). The representations contained in the PowerPoint presentation regarding billing practices were false and directly inconsistent with various of the Undisclosed Lightship Billing Practices in which Lightship was actually engaged.

104. O'Hare, Wilson and Koester and other members of Lightship senior management knew that this financial information contained in the PowerPoint presentation was false, materially misleading and based in material part upon various of the Undisclosed Lightship Billing Practices and that the representations regarding billing practices were materially false and directly inconsistent with various of the Undisclosed Lightship Billing Practices in which Lightship was actually engaged.

105. Oppenheimer and Matlack knew or should have known that this financial information contained in the PowerPoint presentation was false, materially misleading and based in material part upon various of the Undisclosed Lightship Billing Practices and that the representations regarding billing practices were materially false and directly inconsistent with various of the Undisclosed Lightship Billing Practices in which Lightship was actually engaged.

106. These statements were also materially misleading because they represented the operational integrity of the relationship between Lightship's intercarrier compensation revenues

and the Maine ICA despite Lightship's knowledge that the LCA's it was using to calculate applicable intercarrier compensation rates did not reflect the Verizon-defined LCA's, in contravention of the Maine ICA.  The PowerPoint presentation represented that Lightship's procedures were "appropriate" and had been validated by industry experts, when O'Hare, Wilson and Koester knew that its billing practices were not appropriate, and multiple procedures and billing practices in which it was actually engaged were not legally permissible.

107. At no time during the diligence process, or at any time prior to the closing, did O'Hare, Wilson, Koester, Oppenheimer, Matlack, or any other representative of the JP Morgan or Megunticook Entities, or any other Lightship employee, disclose any of the Undisclosed Lightship Billing Practices to CTC.

108. In reliance upon information provided by Lightship during preliminary due diligence, CTC submitted a letter of intent to Q Advisors on February 11, 2005.  The specifics of this letter were reviewed by all appropriate Lightship executives and directors, including O'Hare, Wilson, Oppenheimer and Matlack.

109. In February 2005, CTC specifically requested information seeking to determine whether various types of Lightships revenues depended upon a stable, broad mix of customers, or upon a less stable, smaller number of customers.  CTC requested that Lightship supply:  (1) a list of significant customers including long-term or future contracts; (2) a list of Lightship's top 100 customers on a revenue basis with identification of total monthly billings; and (3) a list of the company's top ten internet customers.  Despite these requests Lightship failed to identify access revenues related to calls to GWI as the source of 90 percent of its Maine access revenues. Given the amount of revenue produced solely by traffic bound for GWI in Maine, Lightship's largest revenue producing State, a greater risk of loss of revenue existed than if that revenue

-27-

were generated by a stable, broader mix of customers. Moreover, had CTC been aware of these circumstances, additional and intensive diligence would have been directed at the quality of that customer relationship and the contractual arrangements in place. Had Lightship disclosed the revenue in Maine attributable to traffic bound for GWI, CTC would have significantly reduced its purchase price.

110. Throughout February and March of 2005, Lightship and the representatives of the JP Morgan and Megunticook Entities continued to provide CTC with information regarding Lightship's finances, billings, revenue, market positions, and historical financial results, along with projections based on purportedly accurate revenue models and EBITDA calculations

111. On or about March 9, 2005, Q Advisors sent an e-mail to James Henry at Bank Street, attaching Lightship's consolidated income statements for January 2005, including Lightship's monthly EBITDA, which was inflated by approximately $200,000 to $300,000 as a result of various of the Undisclosed Lightship Billing Practices.

112. Throughout the due diligence process, repeated questions regarding Lightship billing practices were responded to with false and misleading information. These requests for information and the responses thereto were discussed by O'Hare, Wilson, Koester, Oppenheimer and Matlack and other members of Lightship's senior management. Each of those individuals participated in numerous interstate conference telephone calls and exchanged emails with CTC personnel throughout the process, each providing false, materially misleading information including assurances regarding Lightship's billing practices.

113. Specific requests for information regarding Lightship's compliance with its ICA's were made by various CTC employees, including Pamela Hintz, Prenetta and Peterson, in telephone conference calls and e-mails throughout February and March 2005. Assurances were

given by Lightship that it was in full compliance with its ICAs.  These assurances included

comments made by Koester and Gawlick in telephone conference calls in February and March

2005, which were false because Lightship was not in compliance with, *inter alia*, the Maine ICA

based upon various of the Undisclosed Lightship Billing Practices.

114. On March 10, 2005, Matlack sent an e-mail to Peterson, Prenetta, other CTC

employees, and Oppenheimer.  In this e-mail Matlack stated, *inter alia*, "[W]e are very confident

in our CABS position and do not feel there is an exposure here."

115. On March 12, 2005, in an e-mail chain between, *inter alia*, Oppenheimer, Matlack

and O'Hare, these individuals discussed requests for Lightship billing information from Prenetta.

In this e-mail chain, Oppenheimer suggested that additional information on Lightship's CABS

should not be provided, recognized that disclosure of the information sought might raise

additional questions and raised the issue of whether the information sought would impact the

valuation.

*The Merger and Escrow Agreements*

116. In March 2005, counsel for CTC and Lightship drafted an Agreement and Plan of

Merger reflecting the anticipated transaction (the "Merger Agreement").  On March 18, 2005,

LHI's Board of Directors approved the Merger Agreement and sale transaction with CTC.

117. On March 21, 2005, CTC and Lightship executed the Merger Agreement.  The

Merger Agreement contained multiple representations, warranties and covenants by Lightship

regarding the accuracy of information which it had provided and/or was in the process of

providing as part of CTC's diligence, and the conduct and state of its business pending

consummation of the transaction.

118. Section 4(h) of the Merger Agreement contained representations and warranties by

LHI with respect to financial statements, undisclosed liabilities, and material adverse changes in the conduct of Lightship's business. Lightship represented and warranted, *inter alia,* that financial statements attached to the Merger Agreement fairly presented the financial condition of Lightship as of the dates of those statements and that the results of its operations and changes in cash flow for the periods covered by the statements were in accordance with GAAP. LHI warranted that except as set forth in Schedule 4(h)(ii) of the Merger Agreement, it had no liabilities of a type required by GAAP to be reflected on a consolidated balance sheet, except for liabilities incurred in the ordinary course of business which in the aggregate were not material. Lightship also warranted that its books of account and other material financial records were complete and correct in all material respects and had been maintained in accordance with sound business practices. It also expressly stated that "the Lightship Companies have established and maintained a system of internal controls and procedures to provide assurances that all material information regarding the Lightship Companies' operations and financial condition is communicated to the Lightship Company's management, including their executive officers." Finally, Lightship represented in this section that since its most recent financial statements, its operations had been conducted in the ordinary course of business and there had been no material adverse change.

119. Section 4(i) of the Merger Agreement addressed legal compliance. In this section, LHI represented that except as set forth on Schedule 4(i), the company had complied in all material respects and was currently in compliance in all material respects with all applicable laws. Section 4(k)(iii) represented that all contracts set forth on schedules attached to the Merger Agreement were in full force and effect and that the applicable Lightship Company (as defined in the Merger Agreement) was not in material default under any such contract, nor did any

conditions exist that, with notice or lapse of time or both, would constitute a material default under any such contract.

120. Section 4(e)(i), pertaining to permits and governmental licenses, represented that LHI had no knowledge suggesting that any such permits might be revoked. Section 4(e)(ii) warranted that each of the Lightship Companies was in substantial compliance with terms and conditions of each company regulatory license and that no event had occurred that would result in any impairment of the rights of Lightship with respect to any such company regulatory licenses. In Section 4(e)(iii), LHI warranted that Lightship's operations were in substantial compliance with the terms and conditions of all regulatory licenses and that Lightship had not done anything or failed to do anything that could reasonably be expected to cause the loss of any company regulatory license.

121. Section 5(c) of the Merger Agreement contained pre-closing covenants by LHI. The Merger Agreement extended indemnification to breach of any covenant in the Agreement, and pursuant to Section 7(c) LHI delivered a closing certificate certifying Lightship's compliance with all covenants and obligations in the Agreement requiring compliance prior to closing. In Section 5, LHI covenanted not to engage in any action with the intent to, or which could, directly or indirectly, adversely impact or materially delay the consummation of the transaction, or take any action intended or reasonably expected to result in non-satisfaction of any of the conditions of the Merger. LHI also covenanted that if prior to closing it acquired knowledge of a fact or circumstance constituting a breach of a representation, warranty or covenant or Agreement made within the scope of the Merger Agreement or in any other transaction document, LHI would promptly notify CTC of the existence of any such fact or circumstance. Finally, LHI covenanted that it would supplement or amend any of the disclosure schedules attached to the Merger

Agreement with respect to any matter that, if existing or known at the date of the Agreement, would have been required to be set forth or listed in any such schedule.

122. The Committee was created for the purpose of acting for and on behalf of "Holding Stockholders" with respect to their rights under the Merger Agreement, the Escrow Agreement, and other relevant agreements. Certain Holding Stockholders also executed a Stockholder Representative Agreement by and through which they appointed the Committee as their agent and attorney-in-fact, with full authority and power to represent Holding Stockholders with respect to all matters arising under the Merger Agreement, the Escrow Agreement and other relevant agreements.

123. CTC, the Committee and Mellon also executed the Escrow Agreement pursuant to which $7 million of the transaction purchase price was transferred to Mellon as the escrow agent for deposit into an escrow account to be established in accordance with the Escrow Agreement. The Escrow Agreement provided a mechanism for the submission and resolution of claims by the CTC indemnified parties. Claims determined to be valid were to result in payments to CTC and/or certain indemnified parties from the escrow funds.

124. On or about May 11, 2005, Wilson sent an e-mail to Prenetta and other CTC employees which attached audited financial statements for 2003 and 2004 as well as a working capital calculation as of year-end 2004. This financial information included Lightship's 2004 annual EBITDA which was incorrectly inflated by $2.4 million to $3.6 million as a result of various of the Undisclosed Lightship Billing Practices.

125. On or about May 13, 2005, Wilson sent an e-mail to Prenetta and other CTC employees which attached various Lightship financial information, including consolidated statement of operations for the period January 2005 through April 2005. This financial

information included Lightship's 2004 annual EBITDA which was incorrectly inflated by $2.4 million to $3.6 million, and 2005 EBITDA which was inflated by $200,000 to $300,000 per month, as a result of various of the Undisclosed Lightship Billing Practices.

126. A substantial portion of the financial information contained in these and other materials supplied to CTC during the period from March 21, 2005, through the closing of the transactions, was false and materially misleading and based in material part upon revenue generated from the Undisclosed Lightship Billing Practices, including 2004 and 2005 EBITDA inflated by $200,000 to $300,000 per month (or $2.4 million to $3.6 million per year).  O'Hare, Wilson, Koester, and other senior management of Lightship, knew that this information was false, materially misleading and was based upon the Undisclosed Lightship Billing Practices. Oppenheimer and Matlack knew or should have known that this information was false, materially misleading and based upon the Undisclosed Lightship Billing Practices.

127. The Lightship representations, warranties and covenants set forth in the Merger Agreement, including those set forth above, were false at the time the Merger Agreement was executed.  They remained false throughout the remaining diligence period, and they were false at the time the transaction closed.

128. On May 20, 2005, the transaction closed.  CTC paid approximately $67 million in cash, and acquired all of the LHI stock.  The purchase price reflected an agreed upon valuation of approximately seven times Lightship's stated EBITDA.  LHI filed a Certificate of Merger with the Delaware Secretary of State, and merged with a CTC affiliate.  As a result of this transaction, LHI and Lightship became wholly-owned subsidiaries of CTC.

129. Unknown to CTC, the EBITDA figure upon which the purchase price was determined incorporated and was based upon revenue unlawfully produced by the Undisclosed

Lightship Billing Practices and which was inflated by approximately $200,000 to $300,000 per month (or $2.4 million to $3.6 million per year).

130. At the time of the sale, the stockholders of LHI Holding Stockholders held the following approximate ownership interests on a fully-diluted basis:

| | |
|---|---|
| The JP Morgan Entities | 54.6 percent |
| The Megunticook Entities | 22.5 percent |
| Officers and employees | 18.8 percent |
| Other Investors | 3.0 percent |
| Lenders Warrant | 1.2 percent |

131. The Holding Stockholders continued to be liable under the Merger Agreement and related transaction documents for certain categories of claims.

132. The foregoing false and misleading statements and omissions were intended to, and did cause, CTC directly and proximately to purchase Lightship at an inflated purchase price. Had correct and complete information been disclosed to Defendant by the Fraud and Securities Claims Defendants, Defendant would not have purchased Lightship at the price paid. After the false representations were made, CTC continued to rely on those representations to its detriment. The Fraud and Securities Claims Defendants knew of such reliance but failed to correct the false representations knowing they were false. In reliance on the Fraud and Securities Claims Defendants' false and misleading statements and omissions, CTC priced the transaction far in excess of its true value, and ultimately paid far more for LHI than it would have agreed to pay had the Fraud and Securities Claims Defendants disclosed the true facts, and far more than LHI was in fact worth as a result of the Undisclosed Lightship Billing Practices.

133. The natural and foreseeable consequence of the Fraud and Securities Claims Defendants' acts was to increase the cost of telecommunications services to the public.

*The October 2005 Escrow Claims*

134. Between the closing and November 2006, CTC submitted claims against the escrowed funds totaling in the aggregate approximately $3,000,000 to the Stockholders' Committee arising from certain post closing events.  Only a small fraction of those claims have been acknowledged to be valid.

135. On October 11, 2005, CTC provided a Claim Notice to the Committee and Escrow Agent (the "October 2005 Claims Notice") which itemized specific indemnification items totaling over $3.3 million (the "Enumerated Claims") as follows:

(i)     Claim in the amount of $2,288,725.00 associated with Lightship's failure to appropriately report revenue and pay applicable Federal fees to the Universal Service Administration;

(ii)    Claim in the amount of $25,534.00 for income taxes due for 2004;

(iii)   Claim in the amount of $500,000.00 associated with Lightship's failure to pay Nortel for certain licenses associated with its DMS 100 switches;

(iv)    Claim in the amount of $2,156.91 associated with a default judgment entered against the Company due to its failure to defend a preference claim in the case of *In Re Future Resources Corporation, Debtor, C. Richard McQueen, Trustee for Future Energy we Resources Corporation, Plaintiff v. Lightship Telecom, LLC*;

(v)     Claim in the amount of $26,000 associated with remedial action required to be taken due to the Company's failure to appropriately update the LERG with number blocks (restated in CTC's October 31 letter as $23,000);

(vi)    Claim in the amount of $276,000 associated with the failure of the Company to pay power costs at its Worcester, Massachusetts facility (restated in CTC's October 31 letter as $204,572.43); and

(vii)   Claim in the amount of $197,000.00 relating to various unpaid regulatory fees (restated in CTC's October 31 letter as $198,000).

136. CTC attached to the October 2005 Claims notice more than 150 pages of backup

-35-

documentation, including but not limited to, spreadsheets listing taxable revenue associated with the claims, federal and state tax returns, Site History Reports, Nortel DMS-100 Software Reconciliation Reports, Bankruptcy Court pleadings, Fee Schedules, email communications with the electric utility company that provided power to Lightship's Worcester Massachusetts facility, FCC Remitt Advice/Bill for Collection Notices, and USAC Account Statements.

137. The Committee responded on October 21, 2005 that, notwithstanding the hundreds of pages of backup documentation which accompanied the October 2005 Claims Notice, that Notice failed to provide sufficient detail for the Committee to evaluate the Enumerated Claims. The Committee demanded that CTC provide (a) the particular representation or warranty in the Merger Agreement that was breached for which the Holding Stockholders were liable; (b) the particular indemnification covenant in the Merger Agreement that required indemnification; and (c) whether the Losses had been incurred and paid, incurred and not paid, or only incurred – all information not required to be provided in a claims notice.

138. The backup documentation provided for the Enumerated Claims by CTC in the October 2005 Claims notice was sufficient to state a claim under the Merger Agreement and the Escrow Agreement. None of the Enumerated Claims required inclusion of the specific information demanded by the Committee, and the Committee was able to evaluate these claims at the time they were notified on the basis of the documentation supplied by CTC.

139. The Committee's October 21, 2005 response did not comply with the requirements of Section 5(b) of the Escrow Agreement due to its failure to provide any substantive response or reasonable detail for the Committee's disagreement with the Enumerated Claims. It did not constitute a valid Objection to the October 2005 Claims Notice.

140. On October 31, 2005, CTC responded to the Committee that its October 21, 2005

response did not constitute a valid objection under the Merger Agreement and the Escrow Agreement to the October 2005 Claims Notice.  CTC nonetheless provided the Committee with information that it had requested with respect to each of the Enumerated Claims and also adjusted the amounts of certain of the claims contained in the October 2005 Claims Notice.

141. The Committee responded on November 14, 2005, by contesting three of the seven claims.  Although it acknowledged that two additional claims were likely valid, it requested still more information, including face-to-face communications with certain CTC personnel.  The Committee responded to one of the remaining claims by asserting a purported right to take control of the investigation and defense of the claim.  The Committee agreed with the validity and amount of only one of the seven claims submitted, the smallest one in the amount of $2,156.91.  It did not however issue written instructions to the Escrow Agent to release the funds relating to that claim and those funds have never been released to CTC.

142. By letter to the Committee dated November 21, 2005, CTC agreed to arrange for the Committee to meet with the CTC employees it had requested.  CTC also corrected the Committee's view that the Worcester Facility Claim was a third party claim for which the Committee was entitled to control and direct the investigation and defense, but indicated that if the Committee would agree to address that claim in a specific manner which would assure a continued flow of power to the affected facility, it would agree to permit the Committee to control and direct the defense of that claim.

143. Representatives of the Committee and CTC met at CTC's Waltham, Massachusetts offices on May 25, 2006.  In an effort to further narrow the controversy and expedite resolution of the Enumerated Claims, CTC refined the data used for the calculation of its tax claim as it became available, with the result that the amount of the claim was voluntarily reduced.

144. On July 21, 2006, the Committee provided CTC with a revised response to the Enumerated Claims in which the Committee continued to dispute four of the seven Enumerated Claims but agreed with three claims totaling $224,690.91.  Again, the Committee failed to issue written instructions to the Escrow Agent for these sums to be released to CTC.

*The November 2006 Escrow Claim*

145. By letter dated November 17, 2006, CTC provided the Committee with notice of claims arising from the Undisclosed Lightship Billing Practices and estimated that its loss totaled more than $20 million.  The Committee responded by summarily rejecting the claims set forth in this Notice.

## COUNT I

**(Securities Fraud In Violation of Section 10(b) of the Securities Exchange Act of 1934 And Rule 10b-5 Promulgated Thereunder Against the JP Morgan Entities, the Megunticook Entities, O'Hare and Koester)**

146. Counterclaim Plaintiff repeats and realleges the foregoing Paragraphs 28 through 145 as though fully set forth herein.

147. The foregoing Fraud and Securities Claims Defendants knowingly and/or recklessly made numerous material misstatements of fact and omitted to state material facts necessary in order to make the statements not misleading in light of the circumstances under which they were made.

148. Throughout the negotiation process, the Fraud and Securities Claims Defendants were fully aware of, or recklessly failed to know about, the Undisclosed Lightship Billing Practices and the fact that a disproportionate amount of Lightship's revenue in the State of Maine stemmed from traffic bound for a single customer (GWI), and the material impact on the value of LHI and hence the acquisition price to be paid for LHI based on these facts.

149. Lightship and the Fraud and Securities Claims Defendants failed to disclose the

-38-

existence of the Undisclosed Lightship Billing Practices and the fact that a disproportionate amount of Lightship's revenue in the State of Maine stemmed from traffic bound for a single customer (GWI).  Lightship and the Fraud and Securities Claims Defendants also made numerous false material statements of fact specifically designed to conceal these facts, including but not limited to, those contained in the following communications:

      (a)     The November 2004 CIM;

      (b)     Lightship's December 10, 2004 responses to questions;

      (c)     The January 17, 2005 PowerPoint presentation;

      (d)     Numerous interstate telephone conference calls and discussions with members of CTC's diligence team;

      (e)     The March 9, May 11 and May 13, 2005, e-mails transmitting financial and income statements;

      (f)     The March 10, 2005 e-mail;

      (g)     The Merger Agreement's representations and warranties; and

      (h)     The May 11 and 13, 2005, emails.

150. Each of the Fraud and Securities Claims Defendants had a duty to disclose all material facts relating to the Undisclosed Lightship Billing Practices and GWI.  Each is thus jointly and severally liable.

151. The Fraud and Securities Claims Defendants' false and misleading statements and omissions were intended to and did cause CTC directly and proximately to purchase LHI at an inflated purchase price.

152. The Fraud and Securities Claims Defendants had the opportunity to inflate the purchase price paid by CTC by inflating EBITDA and concealing the fact that traffic bound for a single customer (GWI) accounted for a disproportionate share of Maine EBITDA.  Each of the Fraud and Securities Claims Defendants received a concrete personal benefit from the acts

complained of here in that each received consideration for the sale of the respective interest of each in LHI to CTC.

153. The Fraud and Securities Claims Defendants made use of instrumentalities of interstate commerce including the telephone and e-mail in making these misrepresentations and omissions.

154. CTC reasonably relied on those representations to its detriment. Had correct and complete information been disclosed to the Counterclaim Plaintiff by Lightship and the Fraud and Securities Claims Defendants, Counterclaim Plaintiff would not have purchased LHI at the price paid. The Fraud and Securities Claims Defendants knew of such reliance but failed to correct the false representations knowing they were false.

155. As a direct and proximate result of the foregoing fraudulent conduct, Counterclaim Plaintiff has been proximately damaged by the Fraud and Securities Claims Defendants' fraudulent misstatements and omissions in an amount believed to be no less than $20 million exclusive of all amounts that may be due to Verizon by reason of the aforementioned wrongful billing practices.

### COUNT II

**(Controlling Person Securities Fraud In Violation of Section 20 of the Securities Exchange Act of 1934, 15 U.S.C. § 78t, Against the J.P. Morgan Entities and the Megunticook Entities)**

156. Counterclaim Plaintiff repeats and realleges the foregoing Paragraphs 28 through 145 and 147 through 155 as though fully set forth herein.

157. The acts set forth in Count I above constitute a direct violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

158. The Fraud and Securities Claims Defendants are collectively and/or individually

liable for the loss caused by the misrepresentations and omissions set forth in Count I as persons who controlled LHI and, through LHI, Lightship.

159. As a direct and proximate result of the foregoing fraudulent conduct, Counterclaim Plaintiff has been proximately damaged by the fraudulent misstatements and omissions of the Fraud and Securities Claims Defendants' in an amount believed to be no less than $20 million exclusive of any amounts that may be due to Verizon by reason of the aforementioned wrongful billing practices.

## COUNT III

### (Common Law Fraud and Intentional Misrepresentation Against the JP Morgan Entities, the Megunticook Entities, O'Hare and Koester)

160. Counterclaim Plaintiff repeats and realleges the foregoing Paragraphs 28 through 145 as though fully set forth herein.

161. The Fraud and Securities Claims Defendants intentionally made and conspired to make, and aided and abetted the making of, numerous false statements of material fact and omissions of material fact necessary in order to make statements not misleading in light of the circumstances under which they were made. These misstatements and omissions, including those concerning EBITDA and the fact that a disproportionate amount of Lightship's Maine revenue resulted from traffic flowing to a single customer (GWI), concerned matters of fact known by the Fraud and Securities Claims Defendants to be false.

162. The Fraud and Securities Claims Defendants were fully aware of the false and material nature of the misrepresentations and omissions.

163. The Fraud and Securities Claims Defendants failed to disclose the existence of the Undisclosed Lightship Billing Practices and the fact that a disproportionate amount of Lightship's revenue in the State of Maine stemmed from traffic bound for a single customer

(GWI) and caused Lightship to fail to disclose those facts.  The Fraud and Securities Claims

Defendants also made and caused Lightship to make numerous false material statements of fact

specifically designed to conceal these facts, including but not limited to, those contained in the

following communications:

     (a)    The November 2004 CIM;

     (b)    Lightship's December 10, 2004 responses to questions;

     (c)    The January 17, 2005 PowerPoint presentation;

     (d)    Numerous interstate telephone conference calls and discussions
with members of CTC's diligence team;

     (e)    The March 9, May 11 and May 13, 2005, e-mails transmitting
financial and income statements;

     (f)    The March 10, 2005 e-mail;

     (g)    The Merger Agreement's representations and warranties; and

     (h)    The May 11 and 13, 2005 e-mails.

164. The Fraud and Securities Claims Defendants had a duty to disclose all material facts

relating to the Undisclosed Lightship Billing Practices because they possessed exclusive

knowledge of this information, not ascertainable by Counterclaim Plaintiff, and knew that

Counterclaim Plaintiff was acting on the basis of mistaken knowledge.  The Fraud and Securities

Claims Defendants also had a duty to disclose this information because they had made and/or

conspired to make and/or aided and abetted the making of and/or caused Lightship and LHI to

make false and misleading statements which required additional disclosure to avoid misleading

the Counterclaim Plaintiff.

165. The Fraud and Securities Claims Defendants' false and misleading statements and

omissions were specifically intended to and did cause CTC to directly and proximately rely on

them and to acquire LHI at a price far in excess of its true value.  Had correct and complete

information been disclosed to the Counterclaim Plaintiff by the Fraud and Securities Claims Defendants, the Counterclaim Plaintiff would not have purchased LHI at the price paid.

166. The Fraud and Securities Claims Defendants were motivated to increase the purchase price that CTC would offer and pay for LHI, and thus the amount that each of them would receive for the sale of their respective share of LHI. The Fraud and Securities Claims Defendants knew that CTC's purchase price offer was predicated on a multiple of EBITDA. The Fraud and Securities Claims Defendants had the opportunity to inflate the CTC purchase price by inflating EBITDA and concealing the fact that traffic bound for a single customer (GWI) accounted for a disproportionate share of Maine EBITDA.

167. CTC relied on those representations and omissions to its detriment. The Fraud and Securities Claims Defendants knew of such reliance but failed to correct the false representations knowing they were false. The Counterclaim Plaintiff's reliance on the Fraud and Securities Claims Defendants' representations was reasonable and justifiable. In reliance on the false representations and omissions, CTC priced the transaction far in excess of its true value and ultimately paid far more for LHI than it would have agreed to pay had the Fraud and Securities Claims Defendants disclosed the true facts and far more than LHI was in fact worth.

168. As a direct and proximate result of the foregoing fraudulent conduct, Counterclaim Plaintiff has been proximately damaged by the Fraud and Securities Claims Defendants' fraudulent misstatements and omissions in an amount believed to be no less than $20 million exclusive of all amounts that may be due to Verizon by reason of the aforementioned wrongful billing practices.

## COUNT IV

**(Negligent Misrepresentation Against the JP Morgan Entities, the Megunticook Entities, O'Hare and Koester)**

169. Counterclaim Plaintiff repeats and realleges the foregoing Paragraphs 28 through 145 as though fully set forth herein.

170. The Fraud and Securities Claims Defendants negligently made numerous false statements of material fact and omitted to make other statements of material fact necessary in order to make the statements not misleading in light of the circumstances under which they were made. These negligent misstatements and omissions concerned matters of fact which should have been known in the ordinary exercise of due care by the Fraud and Securities Claims Defendants to be false, specifically concerning the inflation of EBITDA and the non-disclosure of the fact that a disproportionate portion of Lightship revenue from Maine resulted from the traffic flowing to a single customer (GWI).

171. The Fraud and Securities Claims Defendants made and caused Lightship to make, numerous false material statements of fact that concealed these facts, including but not limited to, in the following communications:

(a)     The November 2004 CIM;

(b)     Lightship's December 10, 2004 responses to questions;

(c)     The January 17, 2005 PowerPoint presentation;

(d)     Numerous interstate telephone conference calls and discussions with members of CTC's diligence team;

(e)     The March 9, May 11 and May 13, 2005, e-mails transmitting financial and income statements;

(f)     The March 10, 2005 e-mail;

(g)     The Merger Agreement's representations and warranties; and

(h)     The May 11 and 13, 2005, e-mails.

172. The negligently made false and misleading statements and omissions made by the Fraud and Securities Claims Defendants' caused CTC directly and proximately to purchase LHI at the inflated purchase price.  Had correct and complete information been disclosed to the Counterclaim Plaintiff by the Fraud and Securities Claims Defendants, CTC would not have purchased LHI at the price paid.

173. As a direct and proximate result of the foregoing negligent misrepresentations, Counterclaim Plaintiff has been damaged by the Fraud and Securities Claims Defendants in an amount believed to be no less than $20 million exclusive of all amounts that may be due to Verizon by reason of the aforementioned billing practices.

## COUNT V

**(Breach Of Representations And Warranties Against the JP Morgan Entities, the Megunticook Entities, O'Hare and Koester; And Against Mellon, As Escrow Agent)**

174. Counterclaim Plaintiff repeats and realleges the foregoing Paragraphs 28 through 145 as though fully set forth herein.

175. The Merger Agreement is a valid and binding contract.  The JP Morgan and Megunticook Entities, O'Hare and Koester are all Holding Stockholders as set forth in that Agreement.  As Holding Stockholders, each of the Fraud and Securities Claims Defendants is liable for LHI's breach of representations and warranties contained in the Merger Agreement.

176. The Undisclosed Lightship Billing Practices and the fact that a disproportionate amount of Lightship's revenue in the State of Maine stemmed from traffic bound for a single customer (GWI), breached multiple covenants, representations and warranties contained in the Merger Agreement, including but not limited to the covenants, representations and warranties contained in Sections 4 and 5 set forth above.

177. In the Merger Agreement, each of the Holding Stockholders agreed to indemnify

CTC for any "Losses", including "judgments," "damages" and "Liabilities" including court costs and attorneys' fees and expenses.

178. Pursuant to the Escrow Agreement signed by all of the Fraud and Securities Claims Defendants except the Megunticook Entities, CTC transferred $7 million to nominal Defendant Mellon to be held in escrow by Mellon as escrow agent.  The $7 million was to be used to offset any claim under Section 8 of the Merger Agreement by a CTC Indemnified Party (as defined in Section 8 of the Merger Agreement to include CTC).

179. CTC was required to give notice of any such claim pursuant to Sections 2(c) and 4 of the Escrow Agreement.  CTC did give such notice by letters dated October 11, 2005, October 31, 2005, November 21, 2005, December 12, 2005 and November 17, 2006.

180. As a direct and proximate result of the Fraud and Securities Claims Defendants' multiple breaches of representations and warranties contained in the Merger Agreement, Counterclaim Plaintiff has been damaged in an amount no less than $20 million exclusive of all amounts that may be due to Verizon by reason of the aforementioned wrongful billing practices.

## COUNT VI

**(Declaratory Judgment Against Verizon, The Committee, the JP Morgan Entities, the Megunticook Entities, O'Hare and Koester; And Against Mellon as Escrow Agent)**

181. Counterclaim Plaintiff repeats and realleges the foregoing Paragraphs 28 through 145 as though fully set forth herein.

182. This Count seeks a declaratory judgment pursuant to 28 U.S.C. § 2201 for the purpose of determining a question of an actual controversy.

183. As a result of the Undisclosed Lightship Billing Practices, Lightship collected certain payments from Verizon.  A controversy now exists as to whether those payments were lawful and properly collected or should be refunded, and, in the case of the latter, whether

interest or penalties are due thereon.  Verizon is jointly interested in determining the lawfulness and appropriateness of the practices at issue.

184. Counterclaim Plaintiff seeks a judgment declaring whether or not Verizon is owed money as a result of the Undisclosed Lightship Billing Practices.  If any such money is owed, it is requested that the Court declare the amount, including interest and penalties, if any, due thereon, and award such sum to Counterclaim Plaintiff as additional damages pursuant to Counts I through V.

## COUNT VII

**(Breach of Contract Against The Committee, The JP Morgan Entities, O'Hare And Koester and Mellon, As Escrow Agent)**

185. Counterclaim Plaintiff repeats and realleges the foregoing Paragraphs 28 through 145 as though fully set forth herein.

186. The Committee and its Members and/or those upon whose behalf the Committee was acting breached the Merger Agreement and the Escrow Agreement by failing to submit valid and proper objections to the Claims submitted under the Escrow Agreement by One Communications in October 2005.  As such, the Committee and its Members failed to preserve their right to object to the release of escrowed funds to One Communications.  Despite such failure, the Committee and its Members failed to consent to the release of such escrowed funds to One Communications or to provide nominal Additional Counterclaim Defendant Mellon with proper instructions to release such funds to One Communications.

187. Counterclaim Plaintiff seeks a money judgment equal to the amount of the claims against the escrowed funds together with damages arising out of the breach of the Merger Agreement and the Escrow Agreement.

WHEREFORE, Counterclaim Plaintiff respectfully requests that this Court grant judgment in its favor and against all Counterclaim Defendants as follows:

(a) Judgment for the Counterclaim Plaintiff on all counts together with damages in its favor in an amount to be proven at trial, in addition to pre- and post-judgment interest;

(b) All sums being held in escrow with nominal Additional Counterclaim Defendant Mellon in partial satisfaction of the damages suffered together with an award of additional damages beyond the amount held in escrow;

(c) Punitive damages in favor of Counterclaim Plaintiff;

(d) Costs and disbursements, including attorneys fees; and

(e) Such other or additional relief in favor of Counterclaim Plaintiff as the Court deems just and proper under the circumstances.

## JURY DEMAND

Counterclaim Plaintiff hereby demands trial by jury for all claims set forth in the

Complaint and Counterclaims so triable.

Dated:  New York, NY
        October 5, 2007

TEITLER & TEITLER


By    s/ John M. Teitler
        John M. Teitler (JT-3111)
        Nicholas W. Lobenthal (NL-1451)

1114 Avenue of the Americas
New York, NY 10036
Telephone:  (212) 997-4400
Facsimile:  (212) 997-4949

Attorneys for Defendant and Counterclaim
Plaintiff One Communications Corp.

Of Counsel:
Mark S. Resnick, Esq.
The Resnick Law Group, P.C.
45 School Street
Boston, MA 02108
Telephone:  (617) 722-8383